The Honorable Sue Madison State Representative 573 Rock Cliff Road Fayetteville, Arkansas 72701
Dear Representative Madison:
This is in response to your request for clarification of Op. Att'y Gen.94-041, previously issued by this office, which concluded that a legislative bill to forbid the advertising of gambling, if it allowed the advertising of forms of gambling lawful in this State but prohibited the advertising of other forms of gambling, including casino gambling conducted in nearby states, could be constitutionally suspect under the commerce clause. The opinion also concluded, however, that if the advertising of all forms of "gambling" was prohibited (including those lawfully conducted in this state), such a bill would withstand constitutional scrutiny under both the "commerce clause" and First Amendment free speech clause. The opinion also referenced certain federal legislation in the area regulating the advertisement of "lotteries." Your three questions for clarification of this opinion are as follows:
 1. If the clear intention of a bill to prohibit advertising of illegal forms of gambling is to protect the citizens of Arkansas and preserve our work ethic, would such a bill be constitutionally suspect?
 2. If such a bill would not prohibit advertising within Arkansas of those forms of gambling legal here regardless of where that gambling is located (out of state), is the Commerce Clause concern still viable?
 3. Do the federal statutes referenced on pages 7 and 8 only pertain to lotteries?
In my opinion it will be helpful to answer your third question first, and thereby carve out exactly the conduct prohibited by federal law, so that you will have an idea of the currently allowable conduct which the state might therefore wish to prohibit.
The relevant federal statutes are 18 U.S.C. §§ 1302, 1304 and 1307. The first statute, in pertinent part, prohibits the use of the mail to distribute a publication of any kind, including a newspaper, containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance. This section is subject to regulation by the U.S. Postal Service.
The second statute, 18 U.S.C. 1304, provides in pertinent part as follows:
 Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States, or whoever, operating any such station knowingly permits the broadcasting of, any advertisement or of information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes shall be fined not more than $1,000 or imprisoned not more than one year or both.
Each day's broadcasting shall constitute a separate offense.
This statute is subject to regulation by the Federal Communications Commission ("FCC"). The statute prohibits radio and television stations from broadcasting any advertisements or information concerning any "lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance. . . ."
The third federal statute, 18 U.S.C. § 1307, creates a limited exception to both statutes above. It states that:
 (a) The provisions of sections . . . 1302 . . . and 1304 shall not apply to —
 (1) an advertisement, list of prizes, or other information concerning a lottery conducted by a State acting under the authority of State law which is —
 (A) contained in a publication published in that State or in a State which conducts such a lottery; or
 (B) broadcast by a radio or television stated licensed to a location in that State or a State which conducts such a lottery; or
 (2) an advertisement, list of prizes, or other information concerning a lottery, gift enterprise, or similar scheme, other than one described in paragraph (1), that is authorized or not otherwise prohibited by the State in which it is conducted and which is —
 (A) conducted by a not-for-profit organization or a governmental organization; or
 (B) conducted as a promotional activity by a commercial organization and clearly occasional and ancillary to the primary business of that organization.
This statute thus excepts the advertising or listing of prizes for, or providing of information about any state run lottery if the state in which the newspaper is published or in which the television or radio stations are licensed conducts a state run lottery. It also exempts the advertising or dissimination of information concerning other types of lotteries, gift enterprises or similar schemes if they are not prohibited in the state and are conducted by nonprofit or government organizations or are only conducted by a for profit entity as promotional activity and are clearly occasional and ancillary to the primary business of the organization.
In specific response to your third question, the prohibition contained in18 U.S.C. § 1304, applicable to radio and television stations, has been held by two federal courts to apply not only to "lotteries" as that term is commonly used, but also to casino gaming.[1] See Valley BroadcastingCompany v. U.S., 820 F. Supp. 519 (D. Nev. 1993),[2] and Greater NewOrleans Broadcasting Ass'n. v. U.S., 866 F. Supp. 975(E.D. La. 1994). The primary issue in each case was whether the statute violated First Amendment free speech rights. The Valley Broadcasting case held that18 U.S.C. § 1304, as it applied in Nevada to prohibit Nevada radio and television stations from broadcasting lawful casino gambling activities in Nevada, (and in small measure to residents living in nearby Utah and California) violated the First Amendment. An appeal is currently pending. The Greater New Orleans Broadcasting case upheld the application of 18 U.S.C. § 1304, prohibiting the advertising of casino gaming activities in Louisiana and Mississippi, under a First Amendment challenge. Although these two court decisions differ on the First Amendment issue,[3] each decision concluded fairly summarily that casino gaming advertising came within the wording of the statute and was thus prohibited by it. See 820 F. Supp. at 524, and 866 F. Supp. at 979,each citing F.C.C. v. American Broadcasting Co., 347 U.S. 284 (1954).
In response to your third question, therefore, 18 U.S.C. § 1304, and presumably 18 U.S.C. § 1302, do not pertain only to "lotteries." These statutes also apply to the advertising of casino gambling activities. The exception in 18 U.S.C. § 1307, additionally, does not create an exception for casino gambling advertisements. It excepts only advertising concerning state-run lotteries, and other forms of gambling conducted by nonprofit or governmental entities or by for profit entities if only an occasional promotional activity. See 47 C.F.R. 73.1211(c) and (d)(1).[4] Federal law therefore prohibits all advertisements of commercial "non-occasional" casino gambling by radio and television stations. Why then are such advertisements occurring in Arkansas such that the General Assembly is contemplating prohibiting them? As was stated in Greater New Orleans Broadcasting, supra, ". . . the FCC regulations do not prohibit the broadcast of all information concerning casino gambling in Louisiana and Mississippi. . . . However, advertisements must pertain to the casino's amenities, such as food and rooms. Advertisements cannot promote the gaming aspect of casinos. For instance, under FCC regulations, the word `casino' may be broadcast in an advertisement only if made part of the name of the establishment, but information about certain contests at casinos cannot be broadcast."866 F. Supp. at 980. The court did not cite any particular FCC rule or regulation to this effect because there is none. This state of the law is a result of FCC interpretations that such conduct does not violate18 U.S.C. 1304 because it does not advertise or broadcast information concerning the "lottery, gift enterprise, or similar scheme . . ." itself, but rather the "amenities" offered by the casinos.
Thus, a large portion of gambling advertising is prohibited by federal law. If the Arkansas legislature wished to enact legislation on the subject it would cover new territory only to the extent that it prohibited conduct currently not prohibited by federal law. That is, the most salient portion of such a bill would prohibit that conduct which is not now prohibited and is currently occurring under FCC regulations and interpretations.[5] This would include, with reference to casino gambling, the advertisements touting the "amenities" of the casino.
With this background in mind, I will now address your first question which is whether a bill would be constitutionally suspect under the commerce clause if its clear intention and purpose is to "protect the citizens of Arkansas and preserve our work ethic. . . ." Two things should be noted from the outset. First, it is very difficult to analyze the constitutionality of a hypothetical bill. Only a court presented with all the facts and evidence relating to a particular bill or act could resolve such a question definitively. Secondly, in order to narrow this question somewhat, it should be noted, although it would appear self-evident, that to the extent such a bill would criminalize conduct which is already unlawful under federal law, there is no commerce clause problem. See Pic-A-State Inc. v. Commonwealth of Pennsylvania, 42 F.3d 175
(3rd Cir. 1994); L.E. Services, Inc., v. State Lottery Commission ofIndiana, 1995 WL 33510 (Ind.App. 1995); Connecticut v. Ader, 1992 WL 119194 (Conn.Super. 1992); and Winshare Club of Canada v. Department ofLegal Affairs, 542 So.2d 974 (Fla. 1989) (stating that such an argument would be tantamount to saying that the commerce clause grants a right to break the law). 542 So.2d at 975.[6]
The real inquiry presented by your first question, therefore, is whether a commerce clause problem is presented where a bill prohibits certain gambling advertisements of amenities attendant to enterprises where such gambling is conducted (which advertising is not currently prohibited by federal law) and states as its object the protection of the citizens of Arkansas and the preservation of their work ethic. It should be noted in this regard that the United States Supreme Court has held that a State cannot circumvent the strictures of the commerce clause by "simply invoking the convenient apologetics of the police power." Morgan v.Virginia, 328 U.S. 373, 380 (1946), quoting Kansas Southern Ry. v. KawValley Drainage Distr., 233 U.S. 75, 79 (1914). "[A] State may not, by its police regulations, whatever their object, unnecessarily burden interstate commerce." Reid v. Colorado, 187 U.S. 137, 151(1902). It has also been stated that "when considering the purpose of a challenged statute . . . [the United States Supreme Court] is not bound by `the name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law." Lacoste v. Louisiana Dept. of Conservation, 263 U.S. 545,550 (1924). Thus, a mere recitation in the bill that its object is to protect the citizens and preserve their work ethic will not be accepted by a court on its face. A court faced with the question will look to all the surrounding facts and circumstances to determine whether the true intention of the bill is "simple economic protectionism" (which includes "measures that facially discriminate against out-of-state interests or in favor of in-state interests, and neutral measures motivated by discriminatory purpose"). Pic-A-State, Inc. v. Pennsylvania, 1993 WL 325539 (M.D. Pa.), rev. on other grounds). If the measure is not "simple economic protectionism," a court must determine whether in any event its practical impact unduly burdens interstate commerce under the balancing test set out in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). Thus in response to your first question, the "clear intention" of the bill will not be established by a court in a vacuum. The court will consider all the surrounding facts and circumstances.
Your second question is whether a bill which would not prohibit advertising within Arkansas of those forms of gambling lawful in Arkansas (i.e., thorough bred horse and grey hound dog racing) wherever they are conducted (in state or out of state), but which would presumably prohibit all advertising of other types of gambling, whether conducted in state or out of state, would still give rise to commerce clause concerns. It is my opinion that such a bill would still give rise to commerce clause concerns, but might be subject to a less stringent standard of review under the commerce clause. Some explanation is necessary. It has been stated that "[u]nder the commerce clause, the first focus of inquiry is whether the state is engaging in `economic protectionism' or applying its regulations evenhandedly to intrastate and interstate commerce. [Citation omitted.] Even if a statute regulates evenhandedly and imposes onlyincidental burdens on interstate commerce, it must nonetheless bedeclared invalid if the burden imposed on commerce is clearly excessiveto the putative local benefits. [Citations omitted.] The extent of the burden on commerce that will be tolerated depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Lever Bros. Co. v. Maurer,712 F. Supp. 645, 653 (S.D. Ohio 1989) (emphasis added). Thus your second question posits a type of bill which would appear to regulate "evenhandedly,"[7] authorizing advertising of those forms of gambling which are legal in Arkansas, whether conducted in Arkansas or in other states. Under the test above, however, a court must still weigh the burden imposed on interstate commerce against the putative local benefits of the bill to determine whether its violates the commerce clause. The answer to your second question is therefore, "yes;" the commerce clause concern is still "viable," but will be subject to the balancing test set out above.[8]
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elana C. Wills.
Sincerely,
WINSTON BRYANT Attorney General
[1] It would appear, because the same language is used in18 U.S.C. § 1302, applicable to newspaper advertising, that the same result would obtain under that statute.
[2] An appeal of this case is currently pending in the Ninth Circuit Court of Appeals.
[3] A major factor in the difference of opinion appears to be the United States Supreme Court decision in U.S. v. Edge Broadcasting Co.,
509 U.S. ___, 113 S.Ct. 2696 (1993), which was handed down after the decision in Valley Broadcasting but before the decision in Greater NewOrleans Broadcasting. The Court in Edge upheld, as against a First Amendment challenge, 18 U.S.C. §§ 1304 and 1307 as they applied to prohibit a North Carolina radio station (located in a non state lottery state) from advertising the Virginia state run lottery.
[4] This regulation also exempts advertisements of certain nonprofit fishing contests under 18 U.S.C. § 1305, and any gaming conducted by an Indian Tribe pursuant to the Indian Gaming Regulatory Act.
[5] A question may arise as to whether state legislation in the area is federally preempted. It appears that the answer to this question is "no."See Pic-A-State, supra; Winshare, supra; and Midwest Television, Inc. v.Waaler, 44 Ill. App. 2d 401, 194 N.E.2d 653 (1963), citing Head v. NewMexico Board of Examiners in Optometry, 374 U.S. 424 (1963). See contra,State v. Socony Mobil Oil Company, Inc., 386 S.W.2d 169 (Texas 1964).But see Texas Op. Att'y Gen. JM 646 (distinguishing Socony under the facts presented before the Texas Attorney General because federal law did not prohibit the broadcast of information on "give-away programs," at issue therein, as the element of consideration was lacking).
[6] It is unclear to what extent states are authorized to legislate free of any commerce clause restraints in the area of gambling and lotteries where the conduct regulated is not already proscribed by federal law. It appears to be the law that states have some authority to legislate absent any commerce clause concerns where the consent of Congress to such legislation imposing otherwise unreasonable burdens on interstate commerce has been "expressly stated." See Ader, supra, citingNew England Power Co. v. New Hampshire, 455 U.S. 331 (1982). "There is no talismanic significance to the phrase `expressly stated,' however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant commerce clause, congressional intent must be unmistakably clear." South-Central TimberDev., Inc., v. Wunnicke, 467 U.S. 82, 91 (1984). I cannot conclude that Congressional intent to allow states to prohibit advertising, the legality of which the FCC has comprehensively interpreted and upheld under federal law, is "unmistakably clear."
[7] It has been stated, however, that "[a] state does not regulate even-handedly when it employs the criminal law to ensure that only that species of items which it produces may be sold within its borders." SeeAder, supra, at 4.
[8] The United States Supreme Court decision in Edge Broadcasting,supra, although decided on First Amendment grounds, rather than on commerce clause grounds, may provide some support for the substantial nature of the government interest. See also Posadas de Puerto RicoAssoc. v. Tourism Co., 478 U.S. 328 (1986), noting the "substantial" governmental interest in protecting the citizenry from casino gambling and the constitutionality, under the First Amendment free speech clause, of distinguishing between casino gaming and other types of gambling.